Steven SATTER, Petitioner
and Appellant,

v.

Herman SOLEM, Respondent
and Appellee.

No. 16816.

Supreme Court of South Dakota.

Argued April 24, 1990.

Decided July 11, 1990.

Michael J. Butler and Richard Braithwaite, Sioux Falls, for petitioner and appellant.

Craig M. Eichstadt, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen., on brief, Pierre, for respondent and appellee.

MORGAN, Justice.

This appeal arises from a decision on the habeas corpus petition of Steven Satter

(Satter) challenging the constitutionality of his conviction on two counts of murder. This court affirmed that conviction on direct appeal. *State v. Satter,* 90 S.D. 485, 242 N.W.2d 149 (1976) (*Satter I*). The decision reversing the habeas court was filed April 20, 1988, 422 N.W.2d 425 (S.D. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989) (*Satter II*). In that decision, a plurality voted to reverse, two justices on the basis of an involuntary confession and one on the issue of ineffective assistance of counsel. State petitioned for rehearing and it was granted, but we limited the inquiry to whether Satter's statement made on April 2, 1973, was voluntary and whether there was ineffective assistance of counsel. That opinion, reversing and remanding, was filed on January 4, 1989. *Satter v. Solem,* 434 N.W.2d 725 (S.D.1989), *cert. denied,* —— U.S. ——, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989) (*Satter III*). It held that Satter's statement made on April 2, 1973, was *involuntary* and remanded to the habeas court for determination of the effects of this statement on his conviction in light of the "fruit of the poisonous tree doctrine" announced in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). On remand, the habeas court held an additional evidentiary hearing on April 19, 1989. Police who took Satter's April 5, 11, and 12, 1973, statements as well as law enforcement personnel who searched for the two victims' bodies testified. At the conclusion of this hearing, the habeas court entered an order denying all relief. We reverse and remand.

Much of the pertinent background surrounding the taking of Satter's confessions and the discovery of the victims' bodies is found in *Satter II.*

> While incarcerated in the Codington County Jail because of probation violations involving area burglaries, without having given Satter *Miranda* warnings, petitioner was questioned by Codington County Sheriff Berg (Berg), concerning an anonymous phone tip Berg had received about the location of two bodies. Satter told the sheriff he knew about the bodies because the person who had murdered them had asked him to dispose of the bodies. He volunteered the name of the alleged murderer and the location of the bodies after, according to Satter, Berg promised their conversation was off the record. This conversation was never reduced to writing. At the habeas hearing, the sheriff did not recall having made such a promise. Prior to this interview with Berg, Satter had been interviewed on numerous occasions concerning local and out-of-state burglaries and had been Mirandized prior to each interview.
>
> Following Satter's directions, the bodies were located and a DCI investigator was called in. Satter was given Miranda warnings at each interview thereafter. Satter agreed to a polygraph examination dealing specifically with the murders. Up to this point in time, he had not admitted committing the murders. Satter was Mirandized prior to the polygraph examination and before a post-polygraph examination interview. Satter failed the polygraph and thereafter confessed to the murder of two acquaintances, but maintained his actions were in self-defense. His confession was consistent with that theory. The written confession signed by Satter contained a paragraph offering Satter a future polygraph and a promise that the State would not object to its introduction into evidence at trial. No further polygraphs concerning the murders were offered or given.

422 N.W.2d at 426–27.

On remand, additional facts were developed concerning an independent search for the bodies made by Officer Dennis Koch (Koch), an officer with the Watertown Police Department. Koch testified that in mid-March, 1973, a friend of Satter's, Rick Schmelling (Schmelling), informed Koch that Satter had admitted to a double murder and had taken Schmelling to view the bodies.

Acting on this information, Koch accompanied Schmelling to an abandoned railroad track between Bemis, South Dakota, and Kranzburg, South Dakota in mid-March,

1973. Once there, Schmelling informed Koch that it had been foggy at the time Satter had shown him the burial site and, as a result, he could not point out the precise location of the bodies. Schmelling had directed Koch to within approximately one-half mile of the bodies. On March 31, 1973, Officer Koch and Floyd LeVake (LeVake), Satter's probation officer, returned to the scene and began a search of rock piles along the abandoned railroad grade. They began at Bemis and continued in a northwesterly direction along the abandoned railroad grade. Koch and LeVake not only viewed all rock piles along the railroad grade, but actually moved rocks in an attempt to find the bodies. Though Koch and LeVake's effort proved fruitless on this day, Koch testified that they would have continued their search along the railroad grade on either April 3 or 4, 1973, and moved rocks in all of the rock piles along this railroad grade. Koch stopped his search on March 31, 1973, within one-half to three-quarters mile of the location where the bodies were found. Agent Jerry Lindberg (Lindberg) of the Division of Criminal Investigation (DCI) testified that he photographed the rock pile where the bodies were found shortly after their discovery. The photographs show that a human ear and a human skull were in plain view without moving any rocks on the rock pile. In addition to the photographic evidence, Lindberg and Koch testified that the skull and ear were visible before any rocks were removed from the pile. Additional facts will be supplied when appropriate.

Satter raises the following issues on appeal:

(1) Whether the habeas court exceeded its mandate on remand by the following:

    A. holding an evidentiary hearing to allow State to introduce evidence on inevitable discovery and an independent basis for statements taken on April 5, 11, and 12, 1973;

    B. making findings as to the voluntariness of Satter's April 2, 1973, statement to Sheriff Berg; and

    C. ruling on the habeas court's jurisdiction on a nonconstitutional error.

(2) Whether the habeas court erred in holding that evidence gained as a result of the April 2, 1973, statement was not fruit of the poisonous tree.

(3) Whether the habeas court erred in finding that subsequent statements made after the April 2, 1973, statement were independently admissible.

(4) Whether the admission of Satter's April 2, 1973, statement to Sheriff Berg was harmless error.

Our standard of review for habeas corpus proceeding was recently set out in *McCafferty v. Solem*, 449 N.W.2d 590 (S.D. 1989) *reh'g denied* (Jan. 3, 1990) (*McCafferty III*).

The remedy of post-conviction habeas corpus is restricted by the provisions of SDCL 21–27–16 and the prior decisions of this court. The statutory provisions were fairly well summarized in our decision, *State v. Erickson*, 80 S.D. 639, 129 N.W.2d 712 (1964), wherein we pointed out that, since the remedy is in the nature of a collateral attack upon a final judgment, the scope of review in habeas corpus proceedings is limited. As we said: "habeas corpus can be used only to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases, whether an incarcerated defendant has been deprived of basic constitutional rights." *Id.*, 80 S.D. at 645, 129 N.W.2d at 715. *See also Goodroad v. Solem*, 406 N.W.2d 141 (S.D.1987). Habeas corpus is not a proper remedy to correct irregular procedures, rather, habeas corpus reaches only jurisdictional error. *Id.* 406 N.W.2d at 143; SDCL 21–27–16. For purposes of habeas corpus, constitutional violations in a criminal case deprive the trial court of jurisdiction. *Goodroad*, 406 N.W.2d at 143; *Podoll v. Solem*, 408 N.W.2d 759 (S.D.1987).... Further, we may not upset the habeas court's findings unless they are clearly erroneous. SDCL 15–6–52(a); *Satter v. Solem*, 422 N.W.2d 425 (S.D.1988).

*Id.* at 591–92.

■ First, we address Satter's general argument that the habeas court was not

permitted to take additional evidence. Nothing in our *Satter III* decision restricted the habeas court from taking evidence on the issue of "fruit of the poisonous tree." In fact, we specially instructed the habeas court to consider this issue, since the court in *Satter II* had erroneously ruled that the April 2, 1973, statement was voluntary. Under both SDCL 21–27–14 and 21–27–14.1,[1] the trial judge is empowered to settle the facts and hear *evidence* and argument. The habeas court was within its power to hold a hearing on the effect of the involuntary statement on the other evidence. *See Duffey v. Duffey*, 432 N.W.2d 473, 476 (Minn.Ct.App.1988) ("When trial court receives no specific directions as to how it should proceed in fulfilling the remanding court's order, the trial court has discretion in handling the course of the cause to proceed in any manner not inconsistent with the remand order."). Nothing in the *Satter III* opinion or our February 3, 1989, letter of instructions precluded holding a hearing.

█ Second, Satter claims that even if the habeas court could hold a hearing, the issue of inevitable discovery could have been litigated at earlier proceedings and was not; therefore, State is barred under the theory of res judicata. We disagree.

While it is true that the admissibility of the April 2, 1973, confession was before the trial court in *Satter II,* Judge Hoyt ruled that the confession was voluntary, thus precluding the need to offer evidence on inevitable discovery. To require a prosecutor to provide justification ad nauseum for admission of a confession once it has been ruled admissible and voluntary, would waste valuable court time. Therefore, we do not find that the inevitable discovery issue was or could have been litigated at the first habeas corpus hearing. *See generally Brewer v. Williams*, 430 U.S. 387,

406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424, 441 n. 12 (1977) (recognizing right to accept new evidence during retrial to determine whether there was inevitable discovery).

█ Third, though the habeas court properly held a hearing on inevitable discovery and the effects of "fruit of the poisonous tree" on other evidence and statements, it improperly decided whether the April 2, 1973, statement to Officer Berg was voluntary. Our opinion in *Satter III* was clear on this issue: "What then is the effect of these *involuntary* admissions on Satter's convictions in light of the 'fruit of the poisonous tree doctrine[.]' " (Emphasis added.) 434 N.W.2d at 728. *Satter III* unequivocally states that not only was Satter not given *Miranda* warnings for the April 2, 1973 statement to Officer Berg, but coercion was applied that made the statement *involuntary.* The habeas court simply misread the clear words of our opinion. A statement obtained merely in violation of a *Miranda* warning is not involuntary, but *inadmissible* because a suspect's rights against compulsory self-incrimination under the Fifth Amendment are violated. *Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222, 223 (1985). A statement that is procured by overbearing a suspect's free will is coerced and involuntary, thereby violating a suspect's constitutional Fifth Amendment and Fourteenth Amendment rights to due process. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). If we had meant to only implicate a *Miranda* violation, we would have couched our language in admissibility terms rather than involuntariness. As such, our decision on involuntariness became the law of the case and it was beyond the scope of the habeas court to make a finding on this issue. *Arcon Constr. Co. v. South Dakota Cement*

---

**1.** SDCL 21–27–14 provides: "The court or judge shall proceed in a summary way to settle the facts by hearing the evidence and arguments, as well as of all persons interested civilly, if any there be, as of the applicant and the person who holds him in custody, and shall dispose of the applicant as the case may require."

SDCL 21–27–14.1 provides: "The application shall be heard before any judge of the court in which the conviction took place. A record of the proceedings shall be made and kept. There may be no proceedings on an application by a judge who imposed sentence on the applicant or who otherwise denied him relief concerning the subject matter involved in the application."

*Plant,* 412 N.W.2d 876, 878 (S.D.1987); *American State Bank v. List–Mayer,* 350 N.W.2d 44, 46 (S.D.1984).

As one of its alternative findings, the habeas court determined that it lacked jurisdiction because Satter's issue only implicated a nonconstitutional error: failure to read Satter his *Miranda* rights. . Were those the facts, the habeas court's reading of *Goodroad v. Solem,* 406 N.W.2d 141 (S.D.1987), precluding consideration of nonconstitutional errors on habeas corpus, would be correct. But as we analyzed above, *Satter III* implicated both *Miranda* and Fifth Amendment and Fourteenth Amendment due process issues as to the involuntariness of Satter's April 2 statement. Therefore, a constitutional issue was before the habeas court and it had jurisdiction. *Goodroad, supra.*

■ We next consider Satter's second issue, whether the habeas court erred in holding that evidence gained as a result of the April 2, 1973, statement was not fruit of the poisonous tree. Since the April. 2, 1973, statement to Sheriff Berg was involuntary, the victims' bodies and the bullets within the bodies discovered as a result of this statement are inadmissible unless they were seized as a matter of inevitable discovery. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *Nix* gives the rationale for the inevitable discovery exception:

> When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent' with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule.

467 U.S. at 443–44, 104 S.Ct. at 2509, 81 L.Ed.2d at 387.

In *Nix,* a suspect who had been arraigned was being transported to another city and was questioned against his attorney's wishes and without proper *Miranda* warning. The Court found the confession involuntary, but, nonetheless, allowed the body of the victim into evidence because an independent search party was within two and one-half miles of the body and would have discovered it in the inevitable path of their search.

Similarly, the bodies of Satter's two victims would have been inevitably discovered by Koch and LeVake. When Koch and LeVake stopped their search on March 31, 1973, they were within three-quarters of a mile of the bodies. Considering the thoroughness of their search methods, we believe they would have discovered the bodies on April 3rd or 4th, 1973, upon resuming their search. We believe State established, by a preponderance of the evidence, that Officer Koch would have inevitably discovered the two bodies through his own independent investigation. *Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5, 81 L.Ed.2d at 388 n. 5.

Nor are we dissuaded from this holding by Satter's argument that Koch fabricated this story as a post hoc rationalization. Nothing in the records supports Satter's assertion. Koch testified under oath at the remand hearing about the March tip from Schmelling and subsequent searches he made. He made limited notes of these activities in an April 1973 report. All of Satter's arguments go to credibility of the witness, which the habeas court was in the best position to judge. We will not overturn the habeas court's finding unless it was clearly erroneous. *Cf. In re Proceedings for Deposit in Court,* 417 N.W.2d 187 (S.D.1987); *In Interest of A.D. and D.A.D.,* 416 N.W.2d 264 (S.D.1987). The habeas court's findings as to Koch's search are not clearly erroneous.

Though the habeas court ruled that the physical evidence was admissible because the violation was nonconstitutional, it also held alternatively that the physical evi-

dence was admissible under *Nix'* inevitable discovery rule. We may uphold the habeas court if it is right for any reason. *See State v. McCafferty*, 356 N.W.2d 159 (S.D. 1984).

Next, we take up Satter's third issue on the effect of the April 2 involuntary statement on the admissibility of subsequent statements given to Agent Delbert Peterson (Peterson) of the DCI. Peterson interviewed Satter on April 5, 11, and 12, 1973. On each occasion, Satter was informed of his *Miranda* rights. The habeas court ruled that all three statements were admissible because they were significantly removed from the April 2 statement, thereby attenuating the taint of illegality. We agree as to the April 5th statement and disagree on other grounds as to the April 11th and 12th statements.

■ Even *Wong Sun*, the progenitor of the "fruit of the poisonous tree" doctrine, recognized that original lawless conduct would not taint all evidence forever. The question becomes whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" *United States v. Ceccolini*, 435 U.S. 268, 273–74, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268, 275 (1978) (citing *Wong Sun, supra*). In *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the high court made clear that the taint could be attenuated in confession cases:

> We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.

*Id.* at 496, 86 S.Ct. at 1639, 16 L.Ed.2d at 736. The same principle is recognized for an involuntary confession followed by a warned voluntary confession. *Lyons v. Oklahoma*, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944). Using these principles, we examine each statement.

■ On April 5, Peterson interviewed Satter. Three days had passed since the involuntary confession. He first gave Satter *Miranda* warnings, which Satter stated he understood and waived. At this point, Satter fabricated a story similar to the one told to Sheriff Berg. In this version, a man named "Pianto" rather than "Deluci" had paid Satter to dispose of the bodies. Considering the break in time from the involuntary statement, the fact that Satter was questioned by different law enforcement personnel, a DCI Agent, and the fact that Satter was read *Miranda* warnings, he indicated that he understood them and then waived the same, we believe the taint of the original illegality was sufficiently attenuated so that this statement was admissible. *Ceccolini, supra; Westover, supra; Lyons, supra.*

■ Nor are we dissuaded by Satter's argument that the discovery of the bodies on April 3, 1973, independently tainted this statement. As we noted above, the bodies would have been located through the inevitable discovery of Koch and LeVake. As *Nix* points out, the purpose of admitting inevitable discovery evidence is to place the police in no *worse* position than they would have been in if there had been no misconduct. Since the police would have discovered the bodies before the April 5th interrogation and could have used this in their questioning, it is not an independent taint on the April 5th statement. *Nix, supra.*

■ Furthermore, Satter argues that because he had requested counsel on unrelated charges, had not been supplied an attorney, and had not initiated the new contact, his statement is inadmissible under the rulings of *Edwards v. Arizona*,[2] and *Arizona v. Roberson*.[3] We disagree. *Ed-*

---

2. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

3. 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

*wards* and *Roberson* are new constitutional rules that we need not apply retroactively to Satter's conviction. *Cowell v. Leapley,* 458 N.W.2d 514 (S.D.1990).

Next, we examine the statements taken on April 11th and 12th by Peterson. The April 11th statement was taken in Sioux Falls after Satter had flunked a polygraph. Satter was given *Miranda* warnings, which he waived. He made a statement in which he admitted killing the two men, but claimed it was done in self-defense. The statement also contained the following condition: "This statement is given with the understanding that a polygraph test will be offered to me at a future date. Also that the State will not contest or object to the polygraph test being offered as evidence." The statement made on April 12th merely corrected typographical errors in the April 11th statement and contained the same condition concerning taking of polygraph and its use. Satter was not given a subsequent polygraph. At the habeas hearing, Satter testified that he had made his statement in reliance on the promise of being given a polygraph. Peterson testified that taking a polygraph was not a condition extracted before Satter made his statement and that he made Satter no promises. The habeas court found that Satter was made no promises.

Satter makes the same arguments regarding the taint of the April 11th and 12th statements that he did concerning the April 5th statement. For the same reasons we stated above, in addition to the fact that the statements were taken in a different location, i.e., Sioux Falls, we find the statements were attenuated from the taint of the April 2 statement. *Ceccolini, supra; Westover, supra; Lyons, supra.* In addition, Satter is not entitled to have *Edwards* and *Roberson* applied retroactively. *Cowell, supra.* But our inquiry may not stop here. Satter claims the promise of the polygraph induced him to make his statement. We agree.

■■■■ The habeas court found that Peterson made no promise to Satter. However, this flies in the face of the written promises on the April 11th and 12th state-

ments. The language is clear that the statements were given with the understanding that a new polygraph would be given and State would not contest the admissibility of the results. The habeas court's finding that no promise was made to induce the statement is clearly erroneous.

Though Satter was given adequate *Miranda* warnings, we believe he made a statement in reliance on the promise of a subsequent polygraph and no objection to admission of the results. It is obvious to see why he wanted the polygraph test to back up his statement of self-defense. While there was nothing wrong with this offer, the failure of State to fulfill its promise invalidates Satter's waiver of his rights, and makes his statement involuntary. *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (misrepresentation that suspect would be deprived of state aid to her children if she did not cooperate and provide a statement); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (misrepresentation to suspect that friend would lose job if he did not cooperate and provide statement); *State v. Caffrey,* 332 N.W.2d 269 (S.D. 1983) (suspect told he would be forced to take lie detector, factor in rendering statement involuntary).

Likewise, State's failure to fulfill its promise turned a legitimate offer during interrogation into trickery and an improper inducement, rendering Satter's April 11th and 12th statements involuntary. *Lynumn, supra; Spano, supra; Caffrey, supra.* However, were State to fulfill its promise at this date, we would find that Satter's April 11th and 12th statements were voluntary and admissible.

■■■■ Finally, we take up State's argument that admission of the April 2, 1973, statement was harmless error. The habeas court found that even though it was error to have admitted Satter's statement of April 2, it was harmless error beyond a reasonable doubt. We disagree.

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court recognized that even certain constitutional errors could be harmless if it was determined beyond a reasonable doubt that the error did not contribute to the conviction. We acknowledged the same rule for constitutional errors in *State v. Michalek,* 407 N.W.2d 815 (S.D.1987).

Despite this concession, the high court has stood firm on some rights, noting that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error[.]" *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–28, 17 L.Ed.2d at 710. *Chapman* footnotes *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), a coerced confession case, as an example of the kind of constitutional error that is never harmless. *See also Mincey,* 437 U.S. at 398, 98 S.Ct. at 2416, 57 L.Ed.2d at 303 ("But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.' ").

Here, State attempts to minimize the significance the error played in the jury's verdict by arguing that it did nothing more than reveal a lie about a man named Deluci paying Satter to burn the bodies. This ignores the fact that the coerced confession supplied the first connection from Satter with the two dead victims and directly tied Satter into the crime. Even if Koch would have inevitably discovered the bodies on April 3 or 4, the police would not have had Satter's admissions tying him into the murder of these two men, albeit, only as an accessory after the fact. We cannot say that admission of the April 2 statement was harmless error beyond a reasonable doubt. *Chapman, supra; Payne, supra; Mincey, supra; Michalek, supra.*

Nor are we dissuaded by the federal court of appeals decisions cited on harmless error for adequately warned confessions after an initial improper oral confession. All of these cases are distinguishable because they involved only a failure to give *Miranda* warnings, *not* a coerced involuntary confession. *United States v. Packer,* 730 F.2d 1151, 1157 (8th Cir.1984); *Bryant v. Vose,* 785 F.2d 364, 367 (1st Cir.1986); *United States v. Johnson,* 816 F.2d 918, 922 (3d Cir.1987). Therefore, because we determined in *Satter III* that the April 2, 1973, involuntary statement was taken in violation of Satter's Fifth and Fourteenth Amendment rights to due process, we now hold that he is entitled to a new trial.

To recapitulate: (1) Satter is entitled to a new trial; (2) Satter's April 2, 1973, involuntary statement is inadmissible for any purpose; (3) Satter's April 5, 1973, statement is admissible; (4) Satter's April 11 and 12, 1973, statements are involuntary and inadmissible, until such time as State fulfills its promises regarding a polygraph exam; and (5) the bodies, and bullets found in the bodies, are admissible.

Therefore, we again reverse Satter's conviction and remand to the habeas court with instructions to grant the writ of habeas corpus and to enter an order in conformity with this opinion.

SABERS, J., concurs.

MILLER, J., concurs specially.

HENDERSON, J., concurs in part and dissents in part.

WUEST, C.J., dissents.

MILLER, Justice (concurring specially).

I in no manner depart from my prior dissents in *Satter I* (422 N.W.2d at 430) or *Satter II* (434 N.W.2d at 728). I am convinced that *all* of Satter's statements were admissible and retrial is unnecessary and inappropriate.

Recognizing the futility of my minority position, I join the majority holding so that this case may be *finally* adjudicated.

HENDERSON, Justice (concurring in part and dissenting in part).

Although I agree with the results of this opinion, I find it difficult to accept the ultimate conclusion on subparagraph (4) in the penultimate paragraph of this decision but I agree with the first aspect of subparagraph (4), namely that Satter's April 11, 1973, statements are involuntary and inad-

missible. However, some 17 years later, as I view it, this Court would now permit the State to fulfill its promise and give Satter a promised polygraph examination. The polygraph examination, after the promises were made by the State, seems untimely and could not possibly eradicate the damaging admissions. The evidence is simply too stale; resurrecting the taking of a polygraph exam now (which was not taken before as agreed) casts a shadow on the rendition of timely justice. In my opinion, it is too late and would not cure the involuntary statement of Satter on April 11. As Justice Morgan points out, the April 12 statement only corrected typographical errors. In reading cases in other appellate courts, I note that the phrase "cat out of the bag" is used and these courts rationalize that once the "cat is out of the bag" that these damaging, involuntary and inadmissible statements cannot be rehabilitated by trying to put the "cat back into the bag." This is a classic example, as depicted by subparagraph (4), of 17 years later attempting to put the "cat back into the bag." Surely, Satter would not have made his April 11 and 12, 1973, statements, had he not made the April 2 and 5, 1973, statements. South Dakota still has ample evidence to proceed with a prosecution and the elimination of (4) in the majority opinion would not unduly restrict South Dakota from prosecution.

Lastly, I am opposed to having the polygraph test results admitted, if the State elects to give it under the writing of Justice Morgan, for the reason that this Court has consistently refused to permit polygraph tests to be admitted into evidence in this state. *State v. O'Connor*, 86 S.D. 294, 194 N.W.2d 246 (1972); *State v. Watson*, 248 N.W.2d 398 (S.D.1976); *State v. Muetze*, 368 N.W.2d 575 (S.D.1975); *State v. Waff*, 373 N.W.2d 18 (S.D.1985).

If either the position of the majority court on subparagraph (4) leaves a doubt in the trial judge's mind as to implementing said subparagraph (4); and if this writing and the precedent set forth herein create a further conceptual enigma, the State made a promise that a polygraph examination would be given to Satter. Satter was not given the polygraph test he was promised. The writing of Justice Morgan suggests

that this was trickery. There is no doubt that the promise of the polygraph examination and permitting it to go into evidence was an inducement to have Satter incriminate himself. I do not think that Satter and/or the State can agree, by an understanding between them, that polygraph examination results would be admissible in a court of law in this state. To permit this would, in my opinion, violate stare decisis. Taking the polygraph examination is one act; it is a physical and electronic scenario. Introducing the results thereof is a different matter, encompassing a legal, judicial and evidentiary ruling in a courtroom.

WUEST, Chief Justice (dissenting).

First of all, in no way do I depart from my prior positions as expressed in the dissenting opinions of *Satter I* (422 N.W.2d at 430) or *Satter II* (434 N.W.2d at 728). I write in the present case, however, because I believe that even if the April 2 statement was involuntary and inadmissible (a conclusion with which I do not agree), the admission of this statement was harmless error either under the harmless error rule set forth in *State v. Davis*, 401 N.W.2d 721 (S.D.1987) or *State v. Michalek*, 407 N.W.2d 815, 819 (S.D.1987). Also, I disagree with the majority's conclusion that the April 11 statement was involuntary and inadmissible under the facts in this case. Considering the totality of the circumstances, I would conclude the April 11 statement was voluntary and thus admissible. For these reasons, then, I would affirm the judgment of the habeas court.

The majority declares that Satter is entitled to a new trial because the April 2 statement was taken in violation of Satter's Fifth and Fourteenth Amendment rights to due process. The majority then goes on to hold that the April 5 statement is admissible with which I agree. The April 2 statement and the April 5 statement are essentially the same. The only real difference between the two statements is that in the April 5 version, a man named "Pianto" rather than "Deluci" had paid Satter to dispose of the bodies. This difference be-

tween the two statements, in my opinion, is not of substantial significance. The fact remains that the two statements are essentially the same. Considering this fact, I do not believe the jury might have and probably would have returned a different verdict if the April 2 statement had been excluded from the evidence. Thus, if the admission of the April 2 statement constituted an error, such error was not prejudicial. *See, State v. Davis,* 401 N.W.2d 721, 725 (S.D. 1987). For this reason, I would conclude that the admission of the April 2 statement, if an error at all, was a harmless error not affecting the substantial rights of the appellant. *See,* SDCL 23A–44–14; SDCL 19–9–3. Even under the *Michalek* test applied by the majority, this alleged error was harmless since, I believe beyond a reasonable doubt the alleged error did not contribute to the conviction. *State v. Michalek,* 407 N.W.2d 815, 818 (S.D.1987).

I now address the issue regarding the admissibility of April 11 statement made by Satter. The undisputed facts reveal that prior to the taking of this statement, Satter was given *Miranda* warnings and he waived them. Pursuant to the *Miranda* warnings, Satter was informed that his subsequent statements could and would be used against him in court. At some point it was agreed that Satter's statement would be given if a polygraph examination would be offered to him at a future date, and also that the state would not contest or object to the polygraph test being offered in court. After all of this was done, Satter made a statement in which he admitted killing the two victims. The statement reflected this killing was done in self defense.

Satter contends that the State, in making its offer concerning the polygraph test, deceived him because it never followed through on its promise to provide a polygraph test. Because of this alleged deception, Satter contends that his April 11 statement must be deemed involuntary be-

cause Satter claims he would not have made the statement were it not for the polygraph agreement. In considering whether Satter's statement was voluntary, we must look to the totality of the circumstances surrounding the interrogation. *State v. Caffrey,* 332 N.W.2d 269, 271 (S.D. 1983). Although deception is a factor to be considered in evaluating the totality of the circumstances, *Caffrey, supra* at 272, it is not the only factor to be considered. Here, Satter was given *Miranda* warnings prior to his statement.[1] Pursuant to these warnings, Satter was informed that anything he said could and would be used against him in court. Understanding this, Satter agreed to make a statement. The record reflects that Satter is an intelligent person who had much experience with the criminal justice system.[2] I find these factors to be persuasive regarding the voluntariness of Satter's statement. Further, I do not believe that alleged deception by the State renders Satter's statement involuntary since I am not convinced that Satter would not have given the statement in the absence of the State's polygraph offer. Considering the evidence that was surfacing against Satter, I believe it was wise for him to make the April 11 statement, particularly since the statement supports his claim of self-defense. Finally, I note that "polygraph results are not admissible as evidence in South Dakota Courts." *State v. Muetze,* 368 N.W.2d 575, 588 (S.D.1985); *also see, State v. Watson,* 248 N.W.2d 398 (S.D.1976); *State v. O'Connor,* 86 S.D. 294, 194 N.W.2d 246 (1972). Considering all these factors, I would hold Satter's April 11 statement was voluntary and properly admitted.

Finally, the majority opinion holds we should not apply the new rules set forth in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and in *Arizona v. Roberson,* 486 U.S. 675, 108

---

**1.** The majority opinion cites *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) and *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) in favor of its holding that deception may render a statement involuntary. It is significant to note that these cases were rendered before the *Miranda* case.

Thus, the warnings advocated in the *Miranda* case were not given in *Lynumn* and *Spano.*

**2.** The opposite was true in *Caffrey, supra,* where the appellant was a juvenile. In *Caffrey,* we held that although *Miranda* warnings were given, appellant's statement was still involuntary.

S.Ct. 2093, 100 L.Ed.2d 704 (1988). I agree. See my special concurrence in *Cowell v. Leapley,* 458 N.W.2d 514 (S.D.1990).